# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| JOHN DOE,[1] | )<br>) |
| *Plaintiff*, | )<br>) |
| v. | ) **Civil Action No:**<br>)<br>) |
| ANDREW TUCKER, | )<br>) |
| And | ) **Judge** _____<br>)<br>) **Magistrate** _____ |
| TOWN OF SMYRNA, TENNESSEE | )<br>) **JURY DEMAND** |
| *Defendants.* | ) |

## COMPLAINT

1. Plaintiff **JOHN DOE** brings this 42 U.S.C. § 1983 civil rights claim for damages against Defendants **ANDREW TUCKER** and **TOWN OF SMYRNA, TENNESSEE** alleging violations of Plaintiff's rights under the Fourth Amendment to the U.S. Constitution.

## **PARTIES**

2. Plaintiff **John Doe** is a resident of Rutherford County, Tennessee.

3. Defendant **Andrew Tucker** is an adult resident of Rutherford County, Tennessee who is, or was at all times relevant to this lawsuit, a Town of Smyrna, Tennessee police officer.

4. Defendant **Town of Smyrna, Tennessee ("Smyrna")** is a municipal government organized under the laws of the state of Tennessee.

---

[1] Plaintiff proceeds in this complaint under a pseudonym. Plaintiff will be filing a motion to proceed under a pseudonym or, in the alternative, to amend his complaint to substitute his true name.

1

## JURISDICTION AND VENUE

5. This Court has federal question jurisdiction over the federal claims in this matter pursuant to 28 U.S.C. § 1331. Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2) because all claims related to this case occurred in this district.

## FACTUAL BACKGROUND

### A. Defendant Tucker and the Smyrna Police Department

6. The claims in this lawsuit stem from two sets of unfounded criminal charges filed by Defendant Tucker against Plaintiff in May and June of 2019.

7. Defendant Tucker is a police officer with the Smyrna Police Department, where Tucker has worked as a sworn officer since October 9, 2017.

8. Smyrna hired Tucker despite knowing the following history about him, detailed at paragraphs ¶¶ 9 – 16.

9. In 2009, Tucker was fired from a job at Kmart for stealing from the store.

10. In 2011, Tucker was arrested by the Smyrna Police Department and charged with a felony for shooting guns near a highway, putting people at risk of being shot and killed.

11. In 2011, Tucker was rejected when he applied for a job with the U.S. Marine Corps.

12. In 2013, Tucker was rejected when he applied for a job with the Gallatin, Tennessee Police Department.

13. In 2014, Tucker was rejected when he applied for a job with the Columbia, Tennessee Police Department.

14. In 2015, Tucker was rejected when he applied for a job with the LaVergne, Tennessee Police Department.

15. In 2015, Tucker was rejected when he applied for a job with the Hendersonville, Tennessee Police Department.

16. In 2017, Tucker was rejected when he applied for a job with the Metropolitan Nashville Police Department.

### B. Plaintiff

17. Plaintiff is a 51-year-old man with a long, successful business career.

18. From 1992 – 2011, Plaintiff worked in the field of pharmaceutical sales.

19. In 2011, Plaintiff became a pioneer in the organizing of private equity funds to expand the provision of dermatology services through mergers and acquisitions of local, private practices into regional and national firms.

20. Since 2011, Plaintiff has served as an executive at four different dermatology firms. Plaintiff has served in the roles of President, Chief Executive Officer, Chief Growth Officer, and Director of Strategic Initiatives at four different companies.

21. Plaintiff and his wife, E.C., married on August 6, 2005.

22. Over the course of their marriage, Plaintiff and E.C. had two minor daughters, K.C. and A.C.

23. K.C. was born in 2005, and A.C. was born in 2007.

24. On January 18, 2019, E.C. filed a petition for divorce in the Rutherford County, Tennessee Chancery Court.

25. From January 18, 2019 – May 6, 2019, K.C. resided with Plaintiff in the family's apartment while A.C. and E.C. resided on a farm the family owned.

26. On May 6, 2019, E.C. filed an amended petition for divorce, rented a house, and moved both K.C. and A.C. into it with her.

3

27. At that point, neither party had filed for an interim custody award or parenting plan and no court had authorized E.C. to exercise sole dominion over the children.

28. On May 7, 2019, the Rutherford County Chancery Court issued a *sua sponte* order appointing a Special Master and setting a *pendente lite* hearing for May 30, 2019 to determine an interim parenting plan during the pendency of the divorce.

29. The Chancery Court forwarded its order to Plaintiff's and E.C.'s divorce attorneys. E.C. discussed this order with her attorney and understood that the Chancery Court would be setting a temporary parenting plan based on the May 30, 2019 hearing.

30. Between May 6, 2019 and May 22, 2019, E.C. refused to tell Plaintiff where his daughters were living, even though Tennessee law (T.C.A. § 36-6-101) entitles parents to the right to know their children's address.

31. Between May 6, 2019 and May 22, 2019, E.C. allowed Plaintiff to see his daughters only a few times, and for only an hour at a time each time.

### C. May 22, 2019

32. At 6:14 A.M. on May 22, 2019, E.C. texted Plaintiff asking if he would like to pick the girls up after school and keep them until 7pm.

33. At 11:44 A.M., Plaintiff responded to his wife's text, agreeing to pick up the girls and offering to drop them back at his wife's home at 7pm.

34. At 11:55 A.M., Plaintiff sent another text to his wife noting that he had deposited $500 more than she had had into a joint account for the girls' expenses, and asking that she balance out their contributions.

35. At approximately 12:30 P.M., Plaintiff's divorce attorney talked to E.C.'s divorce attorney, and they agreed that E.C.'s attorney would send over a proposed parenting plan for Plaintiff's attorney to review.

36. E.C. did not respond to these texts, and at 2:24 P.M. Plaintiff texted her again, expressing that he did not understand why she was refusing to give him her address and stating that he was entitled to know where his daughters lived.

37. The plan was for Plaintiff to pick up A.C. at 3:15 PM at her after-school taekwondo studio, and then K.C. from her bus stop at 3:30 PM.

38. At 3:20 P.M., Plaintiff arrived at the taekwondo studio to pick up A.C. However, unbeknownst to Plaintiff, E.C. had already picked A.C. up and left.

39. Plaintiff drove over toward K.C.'s bus stop.

40. At approximately 3:30 P.M., Plaintiff stopped his car at an intersection because of a red light. Across the intersection, facing him at that same red light, was E.C. in her car. K.C. and A.C. were also in E.C.'s car.

41. After seeing Plaintiff across the intersection, and while still stopped at the red light, E.C. texted Plaintiff, writing, "Please have your attorney contact my attorney. I have the girls. They are safe and happy."

42. At 3:31 P.M., Plaintiff responded to this text, writing, "No deal!"

43. E.C. did not respond to Plaintiff's text.

44. At 3:36 P.M., Plaintiff sent another text, stating, "You are keeping me from the girls…"

45. E.C. did not respond to this text.

46. At 3:38 P.M., Plaintiff texted E.C., stating, "See you in court, the judge is not going to like this."

5

47. While sending these three texts over the course of seven minutes, Plaintiff continued driving on I-24, toward his apartment. During this time, which lasted approximately eight minutes, Plaintiff's car was behind E.C.'s car. After sending the third text, Plaintiff turned off and exited I-24 to go to the grocery store to buy bread.

48. After Plaintiff turned off, E.C. drove to the Smyrna Police Department, claimed that Plaintiff had stalked and harassed her, and asked that criminal charges and an order of protection be filed against him.

### D. Tucker Charges Plaintiff with "Stalking" and "Harassment"

49. At 3:51 P.M., Defendant Tucker met with E.C., took her statement, reviewed the text exchanges from the entire day between Plaintiff and E.C., and made a report.

50. Tucker erroneously believed, without a basis in Tennessee law, that as K.C. and A.C.'s mother E.C. had the unilateral legal right to exert total control over K.C. and A.C., including whether to and to what extent Plaintiff could have contact with them.

51. At 4:50 P.M., Tucker called Plaintiff on the phone and told him that he had no right to see his daughters or know where they lived, and that he had to defer completely to E.C.'s wishes on the matter because she was the girls' mother.

52. Plaintiff explained to Tucker that he had a right under Tennessee law to know where his daughters lived, and that he had sent the texts because E.C. had just broken their agreement for Plaintiff to pick the girls up and spend the afternoon with them.

53. Plaintiff told Tucker that he would retain an attorney and hung up the phone.

54. Plaintiff immediately retained a criminal defense attorney.

55. About twenty minutes after Plaintiff hung up with Tucker, Plaintiff's attorney called the Smyrna Police Department and attempted to speak to Tucker. However, Tucker refused to speak to Plaintiff's attorney and never called him back.

56. Tucker made the decision to file criminal charges against Plaintiff for "Stalking" and "Harassment," and prepared warrant affidavits to that effect.

57. However, Tucker's warrant affidavits completely omitted the critical fact, which Tucker was aware of, that Plaintiff and E.C. had agreed that morning that Plaintiff would pick up the girls after school. By omitting this fact, Tucker's affidavit gave the false impression that Plaintiff had just popped up out of nowhere and ambushed E.C.

58. In addition, Tucker's warrant affidavits falsely claimed that E.C.'s texts had told Plaintiff to "cease direct contact" with her, which they did not.

59. Tucker also falsely claimed that Plaintiff sent a "string of texts" after being (allegedly) told to "cease direct contact," without clarifying that the alleged "string" was just the three messages detailed at ¶¶ 42, 44, and 46.

60. Tucker filed the false charges with the Smyrna Municipal Court that same day. Based solely on Tucker's false warrant affidavits, the Municipal Court issued the charges against Plaintiff.

### E. E.C. Obtains an *Ex Parte* Order of Protection to Get Immediate Custody

61. At 7:05 P.M. on May 22, 2019, that same evening, E.C. submitted an application with the Rutherford County Chancery Court for an order of protection.

62. The Rutherford County Chancery Court was the same court in which Plaintiff's and E.C.'s divorce case was already pending.

63. In her order of protection application, E.C. inaccurately claimed that the divorce case was pending in a court *other* than Rutherford County Chancery Court, without identifying which court the divorce case was already pending in.

64. In her order of protection application, E.C. falsely claimed that K.C. and A.C. "needed to be protected from [Plaintiff]."

65. In her order of protection application, E.C. described the encounter detailed at ¶¶ 40 – 48 but completely omitted the fact that she had agreed that Plaintiff could pick up the girls and then picked them up anyway without telling him. By omitting this fact, E.C. created the false impression that Plaintiff had essentially ambushed her near K.C.'s bus stop.

66. In response to the question on the order of protection application asking, "In the last year, how many times has he hurt you?" E.C. provided no answer whatsoever.

67. In response to the question on the order of protection application asking E.C. to describe the alleged abuse, E.C. stated only, "Emotionally threatened and intimidated by driving aggressively behind." E.C. failed to provide the context, failed to explain how short the duration was, and failed to explain that Plaintiff never did anything that came remotely close to creating a risk of a collision or injury.

68. In response to the question on the order of protection application asking, "In the last year, how many times has he threatened you?" E.C. provided no answer whatsoever.

69. E.C. requested in her application for order of protection that the Chancery Court award her immediate temporary custody over K.C. and E.C.

70. E.C. also requested in her application for order of protection that the Chancery Court immediately and completely bar Plaintiff from contacting his daughters by any means whatsoever, even by mail.

8

Case 3:21-cv-00088   Document 1   Filed 02/04/21   Page 8 of 18 PageID #: 8

71. E.C. also requested in her application for order of protection that the Chancery Court order Plaintiff to pay E.C. child support.

72. E.C. also requested in her application for order of protection that the Chancery Court order Plaintiff to move out of the family residence.

73. E.C. also requested in her application for order of protection that the Chancery Court order Plaintiff to attend a "certified batterer's intervention program" and surrender all of his firearms.

74. E E.C. also requested in her application for order of protection that the Chancery Court order Plaintiff to pay all of E.C.'s "court costs, lawyer fees, and taxes" for the case.

75. Based on E.C.'s allegations and, on information and belief, Defendant Tucker's assertions, the Chancery Court opened a new case file separate from the already-pending divorce case, issued the *ex parte* order of protection that same day, and granted all the immediate relief E.C. had requested.

76. That same night, Defendant Tucker swore a false claim on the Order of Protection paperwork that he had personally served Plaintiff with it at 7:08 P.M. that day.

**F. Plaintiff Turns Himself in on Tucker's False Warrants and Spends the Night in Jail**

77. On May 24, 2019, Plaintiff turned himself in on Tucker's warrants. Because of the nature of the charges Tucker filed, under Tennessee law the Smyrna Municipal Court was required to issue a mandatory "12-hour hold," requiring that Plaintiff be held in jail for twelve hours before he could bond out.

78. Plaintiff served his mandatory 12-hour hold, spending the night in jail and then posting a bond to bond out on the morning of May 25, 2019.

### G. June 1st – 2nd, 2019

79. On June 1, 2019, Plaintiff was looking to find a home in his daughters' school district for his parents to buy. Plaintiff's parents were looking to move to Smyrna to be close to Plaintiff and their grandchildren, and Plaintiff wanted their home to be within easy access of his kids' bus stop.

80. At this point, Plaintiff still did not know where E.C. and his daughters were living.

81. That day, Plaintiff saw signs on Almaville Road for an open house that was being held the next day in a neighborhood that was within the girls' school district and near to one of the bus stops.

82. On June 2, 2019, Plaintiff went to the open house, which was at 618 Easy Goer way in Smyrna, Tennessee.

83. Plaintiff spoke with the realtor at the open house, looked around the house, and openly wrote his true name and email address in the realtor's sign-in book.

84. Plaintiff then got into his car and drove away.

85. As Plaintiff drove down Easy Goer way, he realized that he had not inspected the north side of the 618 house for mold.

86. Plaintiff pulled into another driveway, turned around, and stopped back at the 618 address to check the north side of the house for mold. Plaintiff then got back into his car, and drove away from the neighborhood.

### H. June 3, 2019

87. On June 3, 2019, Plaintiff went to the Smyrna Police Department to complain about the false charges filed by Tucker and request that they be dropped.

88. Smyrna Police Department Lieutenant David Cutshaw spoke with Plaintiff in the lobby of the Police Department.

89. Plaintiff explained in detail to Lt. Cutshaw why the warrant affidavits underlying Tucker's "Stalking" and "Harassment" charges were false, and explained that Tucker had committed perjury by swearing that Tucker had served Plaintiff with the order of protection. Plaintiff also explained that he had a right under Tennessee law to know where his children lived, and that Tucker was wrong in asserting that Plaintiff did not have that right.

90. Cutshaw dismissed all of Plaintiff's complaints, and took no action whatsoever to initiate an investigation into Tucker for perjury or for having initiated the false charges.

### I. June 4, 2019

91. On June 4, 2019, Plaintiff went back to the Smyrna Police Department and spoke to Cutshaw again.

92. This time Plaintiff had a clear, legible copy of the *ex parte* order of protection, which he showed to Lt. Cutshaw.

93. Plaintiff went through the allegations in the order of protection application, showing line by line how the allegations were false.

94. Regardless, Cutshaw told Plaintiff that it was out of Cutshaw's hands, and took no action to investigate Tucker for perjury or E.C. for initiating false charges.

### J. June 5, 2019

95. On June 5, 2019, Plaintiff appeared with his attorney before the Smyrna Municipal Court for an initial appearance on the May 22, 2019 criminal charges.

96. In open court, with his wife present, Plaintiff asked the Smyrna Municipal Court Judge, Judge Lynn Alexander, three times whether he could text his daughters.

97. Judge Alexander assured Plaintiff each time he asked that he could text his daughters.

98. After court, at 5:01 P.M. that same day, Plaintiff texted K.C. telling her that he loved both her and A.C. unconditionally and forever.

99. At 5:18 P.M. that same evening, E.C. called the Smyrna Police Department, asked for Defendant Tucker, and claimed that Plaintiff was stalking her.

**K.  June 6, 2019 – Tucker Files False Aggravated Stalking Charges against Plaintiff**

100. On June 6, 2019 Tucker investigated E.C.'s new stalking claim against Plaintiff.

101. Tucker spoke with E.C., spoke with the realtor from the open house, spoke with the realtor's husband, and obtained written statements from all three of them.

102. The realtor confirmed that she had hosted the open house at 618 Easy Goer Way, that "basic directional signs" had been put up in the neighborhood to advertise the open house, and that when Plaintiff came to the open house he openly disclosed his name and contact information to her.

103. Tucker then filed false criminal charges against Plaintiff for three counts of Aggravated Stalking – a felony – and Criminal Contempt, a misdemeanor.

104. Tucker's warrant affidavits falsely claimed that there were no advertisements or directional signs whatsoever for the open house, creating the false impression that Plaintiff had somehow discovered E.C.'s address and then used this allegedly secret open house as a pretext for going to Easy Goer Way to stalk E.C.

105. Based solely on Tucker's false warrant affidavits, the Smyrna Municipal Court issued the false felony criminal charges against Plaintiff.

106. Under Tennessee law, due to the nature of the charges Tucker filed the Municipal Court issued a mandatory "12-hour hold" requiring that Plaintiff serve twelve hours in jail prior to being permitted to bond out.

107. On June 10, 2019, Plaintiff was taken into custody on the June 6, 2019 warrants.

108. Plaintiff served his 12-hour hold in jail, and then posted a bond to bond out.

### L. Tucker's Criminal Charges are Dismissed and Expunged

109. After bonding out again, Plaintiff paid an additional retainer to his criminal defense attorney to contest the June 6, 2019 charges.

110. Plaintiff and his criminal defense attorney spent the next eight months contesting Tucker's May 22, 2019 and June 6, 2019 criminal charges.

111. On February 5, 2020, the Smyrna Municipal Court dismissed all of the May 22, 2019 and June 6, 2019 charges against Plaintiff.

112. On March 16, 2020, the Smyrna Municipal Court ordered Plaintiff's criminal records expunged pursuant to Tennessee law.

### M. The Smyrna Police Department Exonerates Officer Tucker

113. On June 5, 2020, Tucker testified at a hearing in Plaintiff's Chancery Court order of protection proceedings.

114. Tucker admitted on cross-examination that his claim in the May 22, 2019 warrant affidavits that E.C. had told Plaintiff to stop contacting her was not supported by the text messages Plaintiff and E.C. had exchanged that day.

115. Tucker also admitted that the sum total of the dialogue between Plaintiff and E.C. on May 22, 2019 was nine text messages exchanged – none of which contained a threat.

13

116. On June 25, 2020 Plaintiff filed a written complaint with the Smyrna Police Department alleging that Tucker had committed misconduct by filing the false charges against him.

117. Plaintiff supported his complaint with a summary of Tucker's June 5, 2020 testimony, a parental rights sheet documenting Plaintiff's right under Tennessee law to know his daughters' address, copies of the text messages at issue in the May 22, 2019 charges, and copies of the text messages he sent to K.C on June 5, 2019.

118. Lt. Cutshaw opened an internal investigation into Plaintiff's complaint, but recommended that Tucker be exonerated for it even though Tucker's explanation failed to

119. Lt. Cutshaw investigated Plaintiff's complaint, but recommended that Tucker be exonerated even though Tucker failed to demonstrate that he had not committed perjury by filing the false warrant affidavits and by falsely claiming that Tucker had served Plaintiff with the order of protection.

120. Smyrna's Police Department swiftly resolved the complaint in Tucker's favor, exonerating him of any wrongdoing.

121. On information and belief, the Smyrna Police Department's uncritical exoneration of Tucker was consistent with its general handling of citizen complaints alleging civil rights violations by officers.

122. On information and belief, Smyrna's supervision, training, and disciplinary practices create a *de facto* environment in which officers can file unfounded criminal charges against citizens with impunity.

### N. Plaintiff's Damages from Tucker's Misconduct

123. Plaintiff was wrongfully incarcerated on both the May 22, 2019 charges and June 6, 2019 charges. Each time, Plaintiff was incarcerated for over twelve hours due to the "12-hour holds" that are triggered under Tennessee law by domestic abuse charges.

124. To get out of jail, Plaintiff had to post money bonds of $2,000 for the May 22, 2019 charges and $36,000 on the June 6, 2019 charges.

125. After posting bond, Plaintiff had to comply with numerous bond conditions while his charges were pending, including a total bar on any consumption of alcohol whatsoever.

126. To contest the charges, Plaintiff had to pay thousands of dollars in criminal defense attorney fees.

127. In light of the nature of Plaintiff's profession, as an executive dealing with private equity investment firms, merely being charged with criminal offenses was absolutely devastating to Plaintiff's career even though the charges were ultimately dismissed.

128. Plaintiff has suffered significant emotional distress from Tucker's false charges.

# CLAIMS FOR RELIEF

### COUNT I: MALICIOUS PROSECUTION IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS
### (42 U.S.C § 1983)

### (ALL DEFENDANTS)
### (MAY 22, 2019 CHARGES)

129. Plaintiff hereby reincorporates paragraphs 1 – 128 by reference.

130. Defendant Tucker made the decision to file false the false May 22, 2019 charges against Plaintiff.

131. Defendant Tucker did not have probable cause to support the criminal charges.

132. Defendant Tucker's false criminal charges resulted in Plaintiff's detention.

133. Defendant Tucker's false criminal charges were ultimately dismissed.

134. Defendant Town of Smyrna's Police Department policies, training, supervision, and disciplinary practices created an environment of reckless disregard for the risk that Smyrna police officers would file unfounded criminal charges against innocent civilians.

135. Defendant Tucker acted with reckless and intentional disregard for Plaintiff's rights.

136. The false criminal charges inflicted a deprivation of liberty, emotional pain, and financial losses on Plaintiff.

## COUNT II: MALICIOUS PROSECUTION IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS
## (42 U.S.C § 1983)

### (ALL DEFENDANTS)
### (JUNE 6, 2019 CHARGES)

137. Plaintiff hereby reincorporates paragraphs 1 – 128 by reference.

138. Defendant Tucker made the decision to file the false June 6, 2019 charges against Plaintiff.

139. Defendant did not have probable cause to support the criminal charges.

140. Defendant's false criminal charges resulted in Plaintiff's detention.

141. Defendant's false criminal charges were ultimately dismissed.

142. Defendant Town of Smyrna's Police Department policies, training, supervision, and disciplinary practices created an environment of reckless disregard for the risk that Smyrna police officers would file unfounded criminal charges against innocent civilians.

143. Defendant Tucker acted with reckless and intentional disregard for Plaintiff's rights.

144. The false criminal charges inflicted a deprivation of liberty, emotional pain, and financial losses on Plaintiff.

## REQUEST FOR RELIEF

**WHEREFORE**, these premises considered, Plaintiff prays:

1. That the Defendants Answer this Complaint within the time provided by law.

2. That this cause be tried by a jury.

3. That judgment for Plaintiff enter against the Defendants on each count.

4. That Plaintiff be awarded nominal damages on all counts.

5. That Plaintiff be awarded compensatory damages in an amount determined by the jury.

6. That Plaintiff be awarded punitive damages in an amount determined by the jury.

7. That Plaintiff be awarded his attorney's fees and reasonable litigation expenses, including expert witness fees, pursuant to 42 U.S.C. § 1988 and F.R. Civ. Pro. 54(d).

8. That the court costs in this matter be taxed to Defendants.

9. That Plaintiff be awarded pre- and post-judgment interest against Defendants.

10. That Plaintiff be awarded all other relief to which it may appear he is entitled in the interests of justice.

Dated: February 4, 2021

Respectfully submitted,

*s/ Kyle Mothershead*
Kyle Mothershead, BPR 22953
414 Union Street, Suite 900
Nashville, TN 37219
T: (615) 982-8002 / F: (615) 229-6387
E: kyle@mothersheadlaw.com